## Standard Roller Bearing Co. *v.* The Hub Machine Welding and Contracting Co., Appellant.

*Contract—Sale—Substantial performance.*

Where in a contract for automobile axles which are to be manufactured by the seller, the specifications call for dimensions to the fraction of an inch, and it appears that the axles were to be used by the purchaser with other automobile parts, literal and not substantial performance will be required of the seller, except as to slight variations which will not interfere with the use or efficiency of the axles.

If in such a case the purchaser does not reject the axles, which he has a right to do, he must pay the contract price, less such deductions as will pay for making the axles useful, or the price of new axles to take their place, or the value on the market, if he has not attempted either of the two foregoing alternatives.

Argued Dec. 9, 1914.   Appeal, No. 216, Oct. T., 1914, by defendant, from judgment of C. P. No. 5, Philadelphia Co., June T., 1913, No. 4544, on verdict for plaintiff in case of Standard Roller Bearing Company v. The Hub Machine Welding & Contracting Company.   Before RICE, P. J., ORLADY, HEAD, KEPHART and TREXLER, JJ.   Reversed.

Assumpsit for goods sold and delivered.   Before MARTIN, P. J.

The court charged as follows:

The Standard Roller Bearing Company is plaintiff, and the Hub Machine Welding and Contracting Company defendant.   There is evidence to the effect that the Hub Machine Welding and Contracting Company prepared plans and specifications for a small cycle car they were to build, and required axles in the construction of the car.   The plans were submitted to Watkins who represented the standard company, and specifications were prepared for an axle to fit the parts of this car.

On the 11th of March, 1912, the defendant wrote a letter to plaintiff stating that they enclosed plans and specifications for the order to build ten sets of axles at $100.00 apiece. In the specifications the axles were described as "fifty inches tread" and were to be made of Chrome nickel crucible steel castings.

Watkin testified that he told Mr. Lare, the president of the Hub Machine Company, that the fixtures, dies and tools for the axles would cost him about a thousand dollars, and Mr. Lare decided to take the chance on having ten sets made of castings.

[There was evidence that it is the uniform experience in turning out axles that they vary a fraction of an inch, owing to the fact that when metal is heated and poured into a mould and cooled, there is a shrinkage that cannot be avoided. The order was for axles made of castings. In accepting the order the standard company were obliged to substantially comply with its terms, and make axles that complied with the specifications as near as circumstances would permit.] The hub company, when these axles were delivered, was required within a reasonable time to examine them, and if they were not made according to specifications, return them. If defendant kept them, they must pay the price agreed upon if the axles delivered substantially complied with the specifications, or pay the value of the axles if they could have been rejected because they were not made according to the specifications.

Defendant has possession of the axles. Watkin testified that deliveries were made from the 31st of March to the 26th of August, 1912, in four shipments; that Mr. Lare claimed the axles were short, but said if they found they could use them they would go ahead with the work; that Moxley, who was in the employ of the hub company, knew there was a variance in the length of the axles, but stated that they could be used. Watkin, who claims experience in the motor business, expressed the opinion that one-eighth or three-eighths of an inch dif-

ference in the length of axles made no practical difference in assembling the axle in the car, and that they could be used.

Moxley, who designed the car, testified that he did not reject the axles on account of variation in length; that they were capable of being used in the cars he designed; a variation of an eighth of an inch in the length of the axle did not amount to a thing in his opinion. [He also stated that it was known in the engineering business to be impossible in using Chrome nickel steel for axles to make a pattern and figure upon shrinkage which will absolutely bring the actual dimensions.]

Machen, the sales manager of the standard company, testified that axles made of castings were cheaper than those requiring the preparation of dies; and that no complaint had been made by the hub company as far as he knew about the axles until he attempted to collect the account.

Porter, a mechanical engineer, testified that he designed the Mercer racing automobiles and assembled cars, and also was employed by the Worthington Company. He expressed the opinion that a variation of one-eighth of an inch in the tread is of no material difference in the front axle, and would not interfere with the use of rear axles, although it might necessitate adjustment.

The plaintiff claims to have substantially complied with the contract to furnish axles of fifty inches tread; that the hub company accepted the axles, retained them, and therefore should pay for them.......

I perhaps can illustrate what is meant by "substantial compliance," and "acceptance" and "retention." [If you order from a lumber yard a load of inch boards, and in the lumber delivered there are boards five-eighths of an inch, others seven-eights, and some an inch and an eighth, you have the right to decline to accept and may return the lumber. If, however, you conclude that they will answer your purpose, and while you might have obtained boards exactly an inch in thickness had you

ordered planed and finished lumber, instead of rough boards, if you accept the lumber, you must pay for it. You would not be permitted to say, "I will keep what was sent me, but do not propose to pay because the boards are of no use to me." You must return the lumber or pay the value of what you keep.]

On behalf of the defendant, Mr. Lare, the president, testified that there was no delivery of the axles accepted —that they were deposited at defendant's place of business, "billed on memorandum"; that some of the axles were short and others long—the variance being from one-eighth to three-eighths of an inch—and when he complained, Watkin, the man through whom the sale was effected, said, "Let it go a little while and we will make it good." Another objection which he made to the axles is that the holes for the springs were not drilled uniformly so that the car could be assembled without alteration in the axles to locate the spring. He said they took one set of axles and assembled a car, but found it necessary to make a change in the location of the jack shaft that carried the chain which ran from the driving sprocket on the axle. He admitted that he was undecided whether to keep the axles or not, and that they could use them if they chose to put out an inferior car. He explained that the delay in determining the question was occasioned by removal of their place of business. This is not a legal excuse for defendant failing to either promptly accept or reject the axles. A letter was written by the hub company offering to permit the standard company to remove the axles; or stating that the hub company would assemble a car and if the axles worked to their satisfaction, they would consider a settlement, or give a note for $650.00 in full settlement. Those were new propositions for a contract in reference to payment, different from that which had been made. The standard company did not accept any of the propositions, and therefore the question remains open as to the liability of the hub company to the plaintiff upon the origi-

nal contract. Lare said that Watkin insisted on their keeping the axles and trying them out. He also testified that axles similar to those ordered from the standard company, at that time, would cost approximately $1,500.00. There was no explanation why the standard company was willing to furnish the axles for $1,000.00. Lare stated that the axles were practically worthless, but testified that you could use the axles by changing other parts and that it would be necessary to expend to make the changes from $50.00 to $75.00 a car. If he could use these axles by making changes on a car for fifty or seventy-five dollars, it seems to me a little extraordinary that they should be worthless. However, gentlemen, the testimony is for you, and you must determine what it is worth.......

[Gentlemen, you must determine from the evidence you have heard whether there was a substantial compliance by the Standard Roller Bearing Company with the terms of their contract to furnish axles. If there was, your verdict should be for plaintiff for the amount of the claim with interest.]

[If there was not a substantial compliance with the terms of the contract, but the axles were retained by the Hub Machine Company, they are required to pay for them what they were worth.]

If you conclude that the axles had no value, and that the standard company failed to comply with its contract, then the hub company was warranted in procuring such axles as the standard company agreed to furnish them, and should be allowed such sum as they would be required to pay in the market for axles of that kind.

It is alleged on behalf of the hub company that the reason the axles were not accepted is on account of improper length and the fact that holes were not drilled in the right places so that they could be used in conjunction with other parts of the machine.

There was evidence to the effect that plaintiff made a proposition to assemble the cars, or show the defendant

how they could be assembled without expense to the hub company, and that this proposition was not accepted.

It is also alleged on behalf of plaintiff that the reason the axles were not used was because there was difficulty on the part of defendant in procuring the engine required for the cars.

[If the Standard Roller Bearing Company has not substantially complied with its undertaking, and the hub company did not retain the axles, but they have been left with the understanding that the standard company was to remove them, your verdict should be for defendant.]  If you conclude that defendant has been damaged by not obtaining the axles it should have received, and would have been obliged to pay more in the market than the price at which the standard company agreed to furnish them, you should render a verdict for defendant for a sum which is the difference between the price the hub company would be obliged to pay in the market for the axles and the price for which the Standard Roller Bearing Company agreed to purchase them.

Verdict and judgment for plaintiff for $1,106.51.  Defendant appealed.

*Errors assigned,* among others, were (1-6) above instructions quoting them.

*Edward P. Kirby* of *Morris & Kirby,* for appellant.— The court erred in applying the doctrine of substantial performance: Harris v. Sharpless, 202 Pa. 243; Patterson v. Brace, 198 Pa. 107; Wilson v. Belles, 22 Pa. Superior Ct. 477; Dixon Woods Co. v. Phillips Glass Co., 169 Pa. 167; Sturts v. Ziegler, 44 Pa. Superior Ct. 124; Albree v. Philadelphia Co., 201 Pa. 165; Muckle v. Payne, 198 Pa. 444; Harlow v. Homestead Boro., 194 Pa. 57; Johnson v. Freemann, 160 Pa. 317.

The doctrine of substantial performance contemplates a proper allowance or deduction for the contract price: Leggit v. Smith, 3 Watts 331; Chambers v. Jaynes, 4 Pa.

39; Wade v. Haycock, 25 Pa. 382; Monocacy Bridge
Co. v. Bridge Co., 83 Pa. 517; Stickler v. Overpeck, 127
Pa. 446; Johnson v. Freemann, 160 Pa. 317; Gallagher
v. Sharpless, 134 Pa. 134; Holmes v. Oil Co., 138 Pa.
546; Schultz v. Seibel, 209 Pa. 27; Swing v. Bates Ma-
chine Co., 32 Pa. Superior Ct. 403; Kull v. Middleman,
51 Pa. Superior Ct. 137.

*John Arthur Brown,* with him *Henry P. Brown,* for
appellee, cited: Spielberger v. Karr, 24 Pa. Superior Ct.
339; Moneyweight Scale Co. v. Woodward, 29 Pa. Su-
perior Ct. 142; Leawing v. Wise, 73 Pa. 173; Morgan v.
McKee, 77 Pa. 228.

OPINION BY KEPHART, J., October 11, 1915:

The plaintiff brought this action to recover the con-
tract price of ten sets of automobile axles. The speci-
fications for these axles were as follows:

"Front Axle—50″ tread, spring centres 28½″. Axle—
I Beam Section of Chrome Nickel Crucible Steel Cast-
ing, carefully heat treated. Steering Knuckles—30 car-
bon, mild steel drop forged and carefully heat treated.
Finally machined to true and uniform dimensions, as
specified by blue print S. K., No. 6404.

"Rear Axle—50″ tread, 34½″ spring centres. Axle—
I Beam Section of Chrome Nickel Crucible Steel Cast-
ing and heat treated."

The defendant claims that the axles delivered were
not made according to these specifications. The front
axle was about one-eighth inch short and the holes for
the spring attachment were not drilled in their proper
places. The rear axles were short from one-eighth to
three-eights of an inch. These axles could not be used
without making some adjustments at an expense to the
defendant. The plaintiff's testimony was to the effect
that the axles were made according to specifications ex-
cept a slight variation in the length of the front axle
which would not affect either its operation or use. The

court in submitting the case to the jury instructed them
that if there was a "substantial compliance by the Stand-
ard Roller Bearing Company with the terms of their
contract to furnish axles," the verdict of the jury should
be for the plaintiff for the amount of the claim with in-
terest.

It is quite true that the common law doctrine of literal
performance has been modified and substantial perform-
ance is all that is required in most contracts.  "The
equitable doctrine of substantial performance is intend-
ed for the protection and relief of those who have faith-
fully and honestly endeavored to perform their con-
tracts in all material and substantial particulars, so
that their right to compensation may not be forfeited by
reason of mere technical, inadvertant or unimportant
omissions and defects.  It is incumbent on him who in-
vokes its protection to present a case in which there has
been no wilful omission or departure from the terms of
his contract.  If he fails to do so, the question of sub-
stantial performance should not be submitted to the
jury": Gillespie Tool Co. v. Wilson, 123 Pa. 19.

In applying the doctrine of substantial performance
due regard must be had to the nature and character of
the contract, and the writings wherein the parties are
careful to express their understanding.  In contracts
specifying articles to be manufactured in accordance
with dimensions, where exactness to the fraction of an
inch is necessary, it would not do to hold these contracts
to be substantially performed where the article is de-
livered short of the required dimensions.  Substantial
performance in such contracts means literal perform-
ance, except slight variations which will not interfere
with the use or efficiency of the article.  It is always
safer in contracts which specify exactness to hold the
manufacturer to literal performance.  The doctrine of
literal performance was enforced in the case of Harris
v. Sharpless, 202 Pa. 243, and was recognized in Patter-
son v. Brace, 198 Pa. 107.  The front axle being one-

eighth inch short was conceded by all to be not a material variation in the length of the axle as it would not interfere with the steering apparatus or the swing of the front wheels; but the holes for the spring being out of place was a material change in the contract, and if defendant's claim as to this and the shortness of the rear axles be true, the court should have instructed the jury that the defendant was not bound to take the axles, and if it did accept them, and it became necessary to expend money to make them useful, it had a right to claim a set-off for this or purchase new axles to take their place. Under the defendant's theory of the case, the axles could have been moulded to an exact length, making them interchangeable. The defendant was entitled to the performance of the contract in accordance with the specifications, except slight variations not interfering with the accustomed use of the articles. But when such variations cause the vendee to expend money to make the article useful, or if the article as delivered impairs the efficiency of the machine as a whole, the vendee has a right to reject the article. If, as a fact, the articles were not rejected, and the defendant accepted them, it must be held to pay the contract price, less such deductions as will pay for making the axles useful, or the price of new axles to take their place, or the value on the market, if defendant has not attempted either of the foregoing alternatives. In this respect the measure of damages is the same as that applied in the doctrine of substantial performance: Moore v. Carter, 146 Pa. 492; Kull v. Middleman, 51 Pa. Superior Ct. 137.

The court, in its instruction to the jury and the illustration given as to substantial performance of a contract, did not give due weight to the defendant's evidence, and permitted the jury to find substantial performance in defects clearly a violation of the contract. The illustration failed to take into consideration that in an order such as there quoted, it would have been the purchase of articles of a kind or class; but in the pres-

ent case the articles purchased are specific with an im-
plied warranty, and the measure of damages in such case
is different. It is only necessary to sustain the seventh,
eighth and ninth assignments of error, which is here
done.

The judgment is reversed and a venire facias de novo
awarded.